CASES ARGUED AND DETERMINED

IN THE

# SUPREME  COURT

OF THE

# STATE  OF  CONNECTICUT

———————

MARY FAY ET AL. *v.* DENISE W. MERRILL,
SECRETARY OF THE STATE
(SC 20486)

Robinson, C. J., and Mullins, Kahn, Ecker and Moll, Js.

*Syllabus*

Pursuant to article sixth, § 7, of the Connecticut constitution, "[t]he general
assembly may provide by law for voting in the choice of any officer to
be elected . . . by qualified voters of the state who are unable to appear
at the polling place on the day of election . . . because of sickness or
physical disability . . . ."

The plaintiffs, Republican Party candidates in the August, 2020 primary
election for the office of United States representative for Connecticut's
First and Second Congressional Districts, brought the present action
pursuant to statute (§ 9-329a), seeking relief in connection with the
issuance by the defendant, the Secretary of the State, of an application
for absentee ballots that added "COVID-19" as a category for absentee
voting. The defendant had issued the application pursuant to an execu-
tive order issued by the governor in response to the ongoing coronavirus
disease 2019 (COVID-19) global pandemic. The executive order modified
the statute (§ 9-135) setting forth the reasons an eligible voter may vote
by absentee ballot by adding COVID-19 as a reason why a voter may
be unable to appear at his or her polling place on the day of the election.
The plaintiffs sought a judgment declaring that the application was
unconstitutional and based on an erroneous interpretation of the gover-
nor's executive order and § 9-135. The plaintiffs also sought an injunction
precluding the defendant from mailing or distributing copies of the
application to any Connecticut voters and directing the defendant to
recall any copies already mailed or distributed. After a hearing, the trial
court rejected the defendant's claim that the plaintiffs lacked standing

1

2            SEPTEMBER, 2021            338 Conn. 1

Fay *v.* Merrill

because they were not aggrieved by the defendant's decision to issue the application, but the court nevertheless concluded that the plaintiffs' claim that the application unconstitutionally expanded the use of absentee ballots beyond those reasons specified in article sixth, § 7, failed on the merits. Specifically, the trial court concluded that the defendant properly issued the application pursuant to the executive order, insofar as the executive order was not unconstitutional because the phrase "because of sickness," as used in article sixth, § 7, encompassed the public health emergency presented by the COVID-19 pandemic. The court also rejected the plaintiffs' claim that the executive order was a violation of the separation of powers because article sixth, § 7, permits only the General Assembly to act with respect to absentee ballots. The court rendered judgment for the defendant, and the plaintiffs, upon certification by the Chief Justice pursuant to statute (§ 52-265a) that a matter of substantial public interest was involved, appealed to this court. Thereafter, while this appeal was pending, the General Assembly passed legislation (Spec. Sess. P.A. 20-3, § 16), which the governor subsequently signed into law, that ratified the executive order. *Held*:

1. The trial court correctly determined that the plaintiffs were aggrieved by the executive order and, therefore, had standing to seek declaratory relief; the plaintiffs specifically pleaded their interest as candidates as well as that of electors, and their status as candidates in a primary election affected by the executive order gave them a personal interest in the executive order that was distinct from that of an ordinary voter, particularly given the potential effect of widespread absentee voting on the plaintiffs' respective campaign strategies.

2. This court declined to address whether the trial court's judgment could be upheld on the alternative ground that the plaintiffs' action was untimely and, therefore, barred by the equitable doctrine of laches; in light of its determination that the plaintiffs' constitutional claims failed on the merits, the trial court did not address the defendant's laches defense, which is intensely factual in nature, and the record, therefore, was not sufficiently developed with respect to whether the plaintiffs' delay in filing the present action until six weeks after the governor issued the executive order and slightly more than one month before the August, 2020 primary was reasonable.

3. The plaintiffs' claim that the executive order was void as a matter of law on the ground that article sixth, § 7, committed the authority over absentee voting solely to the General Assembly was rendered moot during the pendency of this appeal by virtue of the legislature's passage of Spec. Sess. P.A. 20-3, § 16, which ratified the executive order in its entirety; accordingly, this court dismissed the appeal with respect to the plaintiffs' separation of powers claim.

4. The plaintiffs could not prevail on their claim that the executive order was unconstitutional on the ground that the phrase "unable to appear . . . because of sickness," as used in article sixth, § 7, is limited to an

Fay *v.* Merrill

illness personally suffered by the individual voter that renders him or her physically incapable of travelling to the polling place and does not encompass the existence of a specific disease, such as COVID-19: this court employed the multifactor approach set forth in *State* v. *Geisler* (222 Conn. 672) for construing state constitutional provisions and considered the text and constitutional history of article sixth, § 7, relevant Connecticut, federal and sister state precedent, and this state's public policies, as expressed by the political branches through the governor's executive order and the General Assembly's subsequent ratification of that order, concerning the expansion of absentee voting in order to protect public health and suffrage rights during the exceptional circumstances of a pandemic, in concluding that the language of article sixth, § 7, was sufficiently capacious to include the particular disease of COVID-19; moreover, construing "sickness" to encompass not only an illness suffered personally by a voter but also a pandemic generally was consistent with the state's exercise of its police power to protect the fundamental right to vote and this court's approach of construing absentee balloting statutes liberally in furtherance of the right to vote.

Argued August 6, 2020—officially released February 11, 2021*

*Procedural History*

Action seeking, inter alia, an order rescinding the application for absentee ballot for the August, 2020 primary elections prepared by the Secretary of the State, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Moukawsher, J.*; judgment for the defendant, from which the plaintiffs, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest was at issue, appealed to this court. *Appeal dismissed in part*; *affirmed.*

*Proloy K. Das*, with whom were *Matthew A. Ciarleglio* and, on the brief, *Rachel Snow Kindseth*, for the appellants (plaintiffs).

*Michael K. Skold*, assistant attorney general, with whom were *Clare Kindall*, solicitor general, and, on

* February 11, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Fay *v.* Merrill

the brief, *William Tong*, attorney general, and *Maura Murphy Osborne* and *Alayna M. Stone*, assistant attorneys general, for the appellee (defendant).

*William M. Bloss* filed a brief for the Connecticut Democratic Party et al. as amici curiae.

*Opinion*

ROBINSON, C. J. The principal issue in this public interest appeal is whether Governor Ned Lamont's Executive Order No. 7QQ,[1] which was later ratified by the legislature; see Public Acts, Spec. Sess., July, 2020, No. 20-3, § 16 (Spec. Sess. P.A. 20-3); and which modi-

[1] Executive Order No. 7QQ provides in relevant part: "1. Absentee Voting Eligibility During COVID-19 Pandemic. [General Statutes §] 9-135 . . . is modified to provide that, in addition to the enumerated eligibility criteria set forth in subsection (a) of that statute, an eligible elector may vote by absentee ballot for the August 11, 2020 primary election if he or she is unable to appear at his or her polling place during the hours of voting because of the sickness of COVID-19. For purposes of this modification, a person shall be permitted to lawfully state he or she is unable to appear at a polling place because of COVID-19 if, at the time he or she applies for or casts an absentee ballot for the August 11, 2020 primary election, there is no federally approved and widely available vaccine for prevention of COVID-19. It shall not constitute a misrepresentation under subsection (b) of [§] 9-135 . . . for any person to communicate the provisions of this modification to any elector or prospective absentee ballot applicant.

"2. Notice of Modification Required on Inner Envelope. [General Statutes §] 9-137 . . . is modified to provide that it shall not constitute a false statement for an elector to represent his or her eligibility to vote by absentee ballot pursuant to the modifications of [§] 9-135 in [§] 1 of this order, and the inner envelope described in [§] 9-137 shall contain a notice describing the modification in [§] 1 of this order.

"3. Authority for Secretary of the State to Modify Absentee Ballot Applications, Envelopes, and Printed Materials Regarding Eligibility. Notwithstanding any provision of [t]itle 9 of the . . . General Statutes or any other law or regulation to the contrary, the Secretary of the State shall be authorized to modify any required notice, statement, or description of the eligibility requirements for voting by absentee ballot on any printed, recorded, or electronic material in order to provide accurate information to voters about the modifications to absentee voter eligibility and related requirements of this order. . . ."

Fay *v.* Merrill

fied General Statutes (Rev. to 2019) § 9-135[2] by adding
"COVID-19" as a permissible reason for absentee voting,
violates article sixth, § 7, of the Connecticut constitu-
tion.[3] The four plaintiffs, who were candidates for the
Republican Party's nomination for United States Con-
gress for Connecticut's First and Second Congressional
Districts,[4] appealed directly pursuant to General Stat-

[2] General Statutes (Rev. to 2019) § 9-135 provides: "(a) Any elector eligible
to vote at a primary or an election and any person eligible to vote at a
referendum may vote by absentee ballot if he or she is unable to appear at
his or her polling place during the hours of voting for any of the following
reasons: (1) His or her active service with the armed forces of the United
States; (2) his or her absence from the town of his or her voting residence
during all of the hours of voting; (3) his or her illness; (4) his or her physical
disability; (5) the tenets of his or her religion forbid secular activity on the
day of the primary, election or referendum; or (6) the required performance
of his or her duties as a primary, election or referendum official, including
as a town clerk or registrar of voters or as staff of the clerk or registrar,
at a polling place other than his or her own during all of the hours of voting
at such primary, election or referendum.

"(b) No person shall misrepresent the eligibility requirements for voting
by absentee ballot prescribed in subsection (a) of this section, to any elector
or prospective absentee ballot applicant."

Hereinafter, all references to § 9-135 are to the 2019 revision.

[3] Article sixth, § 7, of the Connecticut constitution provides: "The general
assembly may provide by law for voting in the choice of any officer to be
elected or upon any question to be voted on at an election by qualified
voters of the state who are unable to appear at the polling place on the day
of election because of absence from the city or town of which they are
inhabitants or because of sickness or physical disability or because the
tenets of their religion forbid secular activity."

[4] The plaintiffs are Mary Fay, an elector and candidate for United States
Representative for the First Congressional District, Thomas Gilmer, an elec-
tor and candidate for United States Representative for the Second Congres-
sional District, Justin Anderson, an elector and candidate for United States
Representative for the Second Congressional District, and James Griffin,
an elector and candidate for United States Representative for the First
Congressional District.

We note that Fay and Anderson subsequently prevailed in the primary
election held on August 11, 2020, and received the Republican Party's nomi-
nations for the offices of United States Representative for the First and
Second Congressional Districts, respectively. See M. Pazniokas, "Recount
Gives GOP Nomination to Justin Anderson in CT-2," The Connecticut Mirror,
August 18, 2020, available at https://ctmirror.org/2020/08/18/recount-gives-
gop-nomination-to-justin-anderson-in-ct-2/ (last visited February 9, 2021); M.
Pazniokas, "The Connecticut Primary: A Perfunctory Contest for President,
and a Long Wait for Others," The Connecticut Mirror, August 11, 2020, avail-

Fay *v.* Merrill

utes § 52-265a[5] from the judgment of the trial court in favor of the defendant, Denise W. Merrill, Secretary of the State, in this action seeking declaratory and injunctive relief with respect to the defendant's change of the absentee ballot application for the August 11, 2020 primary election (August primary) to add coronavirus disease 2019 (COVID-19) as a new reason for requesting an absentee ballot pursuant to Executive Order No. 7QQ. Following deliberations after an expedited oral argument held on August 6, 2020, we ruled from the bench that (1) the plaintiffs were aggrieved and had standing to bring the declaratory judgment action, (2) we could not consider, for the first time on appeal, the defendant's special defense of laches as an alternative ground for affirming the judgment of the trial court, and (3) Executive Order No. 7QQ does not violate article sixth, § 7, because the phrase "unable to appear at the polling place on the day of election because of . . . sickness," as used in that constitutional provision, is not limited to an illness suffered by the individual voter that renders that person physically unable to travel to the polling place. Accordingly, we affirmed the judgment of the trial court and indicated that a written opinion would follow. This is that opinion.

able at https://ctmirror.org/2020/08/11/the-connecticut-primary-a-perfunctory -contest-for-president-and-a-long-wait-for-others (last visited February 9, 2021).

[5] On July 23, 2020, Chief Justice Robinson granted the plaintiffs' application for permission to file an expedited public interest appeal pursuant to § 52-265a. See General Statutes § 51-199 (b) (9) ("[t]he following matters shall be taken directly to the Supreme Court . . . any matter brought to the Supreme Court pursuant to section 52-265a"). After Chief Justice Robinson ordered an expedited briefing schedule culminating in an oral argument held remotely on August 6, 2020, we granted the motion of the Connecticut Democratic Party, Kate Farrar and Sherry Haller for permission to appear as amici curiae and to file a brief.

We thank all counsel for their professionalism during the briefing and argument of this appeal. This high level of professional conduct is particularly noteworthy given the unique exigencies posed by the ongoing COVID-19 pandemic, which were compounded by the severely damaging effects of Tropical Storm Isaias two days before oral argument in this case.

Fay *v.* Merrill

The pleadings and the record reveal the following undisputed facts and procedural history. On March 10, 2020, Governor Lamont declared a public health and civil preparedness emergency "throughout the [s]tate . . . as a result of the [COVID-19] outbreak in the United States and Connecticut . . . ." COVID-19 is a "respiratory disease that spreads easily from person to person and may result in serious illness or death," and "public health experts have indicated that persons infected with COVID-19 may not show symptoms, and transmission or 'shedding' of the coronavirus that causes COVID-19 may be most virulent before a person shows any symptoms . . . ." The United States Centers for Disease Control and Prevention have "recommended that people with mild symptoms consistent with COVID-19 be assumed to be infected with the disease," and "public health experts have recommended that, to prevent transmission of COVID-19, and in light of the risk of asymptomatic transmission and a significant rate of false negative tests, everyone should assume they can be carrying COVID-19 even when [they] have received a negative test result or do not have symptoms . . . ."

Given the greater danger of COVID-19 to "elderly registered voters [who] consistently demonstrate the highest rate of voter turnout" and the "significant portion of poll workers and volunteers [who] are [sixty years old] or older," Governor Lamont determined that "providing an alternative to [in person] voting could be particularly helpful in reducing the risk of transmission during voting among this population . . . ." Accordingly, on May 20, 2020, he issued Executive Order No. 7QQ pursuant to his powers under General Statutes § 28-9 (b) (1)[6] to provide that alternative to in person voting for the August primary.

---

[6] General Statutes § 28-9 (b) (1) provides in relevant part: "Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency

Fay *v.* Merrill

Specifically, Executive Order No. 7QQ, inter alia, "modified [§ 9-135] to provide that, in addition to the enumerated eligibility criteria set forth in subsection (a) of that statute, an eligible elector may vote by absentee ballot for the [August primary] if he or she is unable to appear at his or her polling place during the hours of voting because of the sickness of COVID-19. *For purposes of this modification, a person shall be permitted to lawfully state he or she is unable to appear at a polling place because of COVID-19 if, at the time he or she applies for or casts an absentee ballot for the* [*August primary*], *there is no federally approved and widely available vaccine for prevention of COVID-19.* It shall not constitute a misrepresentation under subsection (b) of [§] 9-135 . . . for any person to communicate the provisions of this modification to any elector or prospective absentee ballot applicant." (Emphasis added.)

In late June, 2020, the defendant, acting pursuant to her general supervisory authority over elections in Connecticut, issued the application for absentee ballots for the August primary (application). The application added "COVID-19" as a new, seventh reason for requesting an absentee ballot; it is listed first among

pursuant to section 19a-131a, *the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.* The Governor shall specify in such order the reason or reasons therefor and any statute, regulation or requirement or part thereof to be modified or suspended and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced. Any such order shall have the full force and effect of law upon the filing of the full text of such order in the office of the Secretary of the State. . . . *Any statute, regulation or requirement, or part thereof, inconsistent with such order shall be inoperative for the effective period of such order.* Any such order shall be communicated by the Governor at the earliest date to both houses of the General Assembly." (Emphasis added.)

Fay *v.* Merrill

the reasons for "expect[ing] to be unable to appear at the polling place during the hours of voting,"[7] with an adjacent notation in bold print that "[a]ll voters are able to check this box, pursuant to Executive Order [No.] 7QQ."[8] (Emphasis omitted.)

As previously stipulated by the parties, "[t]he defendant anticipate[d] a significant increase in the use of absentee ballots this year and, working with a third-party mailing vendor (vendor), ha[d] mailed 1,274,414 applications to active registered voters between June 26 and July 1, 2020.[9] As of July 15, 2020, more than 100,000 voters ha[d] completed and returned their applications to local election officials for processing; 107,743 applications ha[d] been processed as of that date. The information contained in each application [was] then downloaded by the defendant's office onto a computer

[7] The other six reasons provided on the application are (1) "[m]y active service in the Armed Forces of the United States," (2) "[m]y absence from the town during all of the hours of voting," (3) "[m]y illness," (4) "[m]y religious tenets forbid secular activity on the day of the election, primary or referendum," (5) "[m]y duties as a primary, election or referendum official at a polling place other than my own during all of the hours of voting," and (6) "[m]y physical disability."

[8] The "special instructions" at the bottom of the application provide in relevant part: "The [s]tate . . . via Executive Order [No.] 7QQ, as interpreted by the [defendant] pursuant to [General Statutes § 9-3], has determined [that] (1) . . . having a [preexisting] illness allows you to vote by absentee ballot because your [preexisting] *illness* would prevent you from appearing at your [designated] polling place or (2) . . . absent a widely available vaccine, the existence of the COVID-19 virus allows you to vote by absentee ballot if you so choose for your own safety. To receive your absentee ballot please complete and sign this application (be sure to check 'Illness' for reason (1) or 'COVID-19' for reason (2) above) and return it to your [t]own [c]lerk using the enclosed postage prepaid envelope. . . ." (Emphasis in original.)

[9] "Ordinarily, 3 to 5 percent of voters vote by absentee ballot; the experience of similar jurisdictions indicates that between 50 and 80 percent of Connecticut voters will apply for, and likely use, absentee ballots for the August primary. The printing and mailing of the applications cost the state approximately $850,000." *Fay* v. *Merrill*, 336 Conn. 432, 439 n.11, 246 A.3d 970 (2020).

Fay *v.* Merrill

file, which was provided to the vendor approximately every other day beginning on July 17, 2020. The vendor was scheduled to mail the appropriate absentee ballots to the approved voters once those ballots were finalized after July 21, 2020.'' (Footnote in original.) *Fay* v. *Merrill*, 336 Conn. 432, 439, 246 A.3d 970 (2020).

On July 1, 2020, the plaintiffs filed a petition and complaint with a single Supreme Court justice pursuant to General Statutes §§ 9-323, 52-29 and 52-471, claiming that the application was a ''ruling of an election official'' that violated article sixth, § 7, as well as a violation of Executive Order No. 7QQ and § 9-135. After a hearing held on July 20, 2020, Chief Justice Robinson granted the defendant's motion to dismiss that proceeding for lack of subject matter jurisdiction, concluding that § 9-323 does not apply to primaries, including those for federal congressional office. See *Fay* v. *Merrill*, supra, 336 Conn. 436.

That same day, the plaintiffs brought the present action in the trial court pursuant to General Statutes §§ 9-329a, 52-29 and 52-471. The plaintiffs first claimed that Executive Order No. 7QQ violates article sixth, § 7, of the Connecticut constitution because (1) the constitutional provision ''expressly commits the prescription of absentee voting procedure to the General Assembly—not to the governor,'' and (2) the executive order ''broadens the use of absentee ballots, in contravention of the strict reasons for which absentee ballots may be used in Connecticut elections as set forth in article sixth, § 7.''[10] Second, the plaintiffs claimed that the defendant's ''decision to expand absentee voting based on Executive Order No. 7QQ, rather than [to] limit absentee voting in accordance with the restrictions set forth by the legislature in . . . § 9-135, was a ruling

---

[10] The plaintiffs also pleaded that ''[t]here is no COVID-19 exception in the Connecticut constitution.''

Fay *v.* Merrill

of an election official'' that violated the Connecticut
constitution because (1) the defendant ''lacks the con-
stitutional authority to alter the parameters of who is
entitled to vote by absentee ballot,'' (2) ''[t]he reasons
that electors may vote by absentee ballot are strictly
limited by the Connecticut constitution and can . . .
be expanded [only] by the electorate,'' and (3) the appli-
cation ''expands the use of absentee ballots for reasons
beyond [the six] specifically prescribed in article sixth,
§ 7, of the state constitution.''[11] Claiming to be aggrieved
as candidates and electors by these various violations,
the plaintiffs sought a judgment declaring that the appli-
cation is unconstitutional and based on an erroneous
interpretation of Executive Order No. 7QQ and § 9-135.
They also sought an ex parte prohibitory injunction
precluding the defendant from mailing or distributing
copies of the application to any Connecticut voters and
an ex parte mandatory injunction directing her to recall
any copies already mailed or distributed to any Connect-
icut voters.

On July 22, 2020, after a hearing, the trial court issued
a memorandum of decision concluding that the defen-
dant properly issued the application pursuant to Execu-
tive Order No. 7QQ, insofar as the executive order did
not violate article sixth, § 7, because the phrase
''because of sickness,'' as used therein, encompassed
''a sickness of a nearly unique character,'' namely, the
public health emergency presented by the COVID-19
pandemic. The court described Executive Order No.

_____

[11] The plaintiffs also claimed that the defendant's ''decision to add a new
category called 'COVID-19' and her failure to include the restrictions con-
tained in Executive Order No. 7QQ concerning that reason—i.e., the voter
being unable to appear and the unavailability of a vaccine—constitute a
ruling of an election official'' that ''ignored the important qualification'' to
that effect in the executive order. The trial court did not address this issue
given the parties' apparent concession that the ''case would live or die by
[the court's] ruling'' as to the constitutionality of Executive Order No. 7QQ,
and it is not before us in this appeal.

Fay *v.* Merrill

7QQ as "far from saying [that] the law means any sickness, anywhere, anytime," with fatality statistics demonstrating that "COVID-19 is the scourge of the earth" and a "sickness of a lethality and ubiquity unknown for [one] hundred years."[12] The court further rejected the plaintiffs' claim that Executive Order No. 7QQ was unconstitutional under article sixth, § 7, because that provision permits only the General Assembly to act with respect to absentee ballots. The court deemed that argument inconsistent with the governor's emergency powers as delegated by the legislature under § 28-9 (b) (1), the constitutionality of which the plaintiffs did not question.

Although it reached the merits of the constitutional issues, the trial court also rejected several jurisdictional and procedural defenses advanced by the defendant. First, the court determined that any lack of jurisdiction over the constitutional claims under § 9-329a, the primary contest statute, was immaterial because, "at a minimum, the court has jurisdiction under . . . § 52-29, the declaratory judgment statute." Second, the trial court rejected the defendant's claim that the plaintiffs were not aggrieved, reasoning that they "are not ordinary voters. They are candidates for office with direct interests at stake and with immediate conduct—encouraging or discouraging absentee ballots—hanging in the balance." Finally, given its decision on the merits, the trial court deemed the defendant's laches defense moot. Accordingly, the trial court rendered judgment for the defendant. This public interest appeal followed. See footnote 5 of this opinion.

During the pendency of this appeal, the General Assembly passed Spec. Sess. P.A. 20-3, "An Act Con-

_____

[12] The trial court noted: "Suffice it to say that cold and flu season [would not] be enough. Those circumstances would leave the exception of absentee balloting swallowing the rule of in person voting. This is a far case from that."

338 Conn. 1          SEPTEMBER, 2021          13

Fay *v.* Merrill

cerning Absentee Voting and Reporting of Results at
the 2020 State Election, Expanding Election Day Regis-
tration and Ratifying Certain Provisions of an Executive
Order that Relate to the August 11, 2020, Primary,''
which Governor Lamont signed into law on July 31,
2020. Spec. Sess. P.A. 20-3, inter alia, extends the
COVID-19 provisions of Executive Order No. 7QQ to
the state election scheduled for November 3, 2020. See
Spec. Sess. P.A. 20-3, §§ 1 and 2.[13] It also ratifies Execu-

---

[13] Spec. Sess. P.A. 20-3 provides in relevant part: "Section 1. Section 9-
135 of the general statutes is repealed and the following is substituted in
lieu thereof (*Effective from passage*):

"(a) Any elector eligible to vote at a primary or an election and any person
eligible to vote at a referendum may vote by absentee ballot if [he or she]
such elector or person is unable to appear at [his or her] such elector's or
person's polling place during the hours of voting for any of the following
reasons: (1) [His or her] Such elector's or person's active service with the
armed forces of the United States; (2) [his or her] such elector's or person's
absence from the town of [his or her] such elector's or person's voting
residence during all of the hours of voting; (3) [his or her] such elector's
or person's illness; (4) [his or her] such elector's or person's physical disabil-
ity; (5) the tenets of [his or her] such elector's or person's religion forbid
secular activity on the day of the primary, election or referendum; [or] (6)
the required performance of [his or her] such elector's or person's duties
as a primary, election or referendum official, including as a town clerk or
registrar of voters or as staff of the clerk or registrar, at a polling place
other than [his or her] such elector's or person's own during all of the hours
of voting at such primary, election or referendum; or (7) for the state election
in 2020, the sickness of COVID-19. As used in this section, 'COVID-19' means
the respiratory disease designated by the World Health Organization on
February 11, 2020, as coronavirus 2019, and any related mutation thereof
recognized by said organization as a communicable respiratory disease.

"(b) No person shall misrepresent the eligibility requirements for voting
by absentee ballot prescribed in subsection (a) of this section, to any elector
or prospective absentee ballot applicant.

"Sec. 2. Section 9-137 of the general statutes is repealed and the following
is substituted in lieu thereof (*Effective from passage*):

"(a) Each absentee ballot shall be returned to the municipal clerk, inserted
in an inner envelope which shall be capable of being sealed and which shall
have printed on its face a form containing the following statements:

" 'I hereby state under the penalties of false statement in absentee balloting
that I am eligible to vote at the primary, election or referendum in the
municipality in which this absentee ballot is to be cast and that I expect to
be unable to appear at my polling place during the hours of voting at such
primary, election or referendum for one or more of the following reasons:

tive Order No. 7QQ in its entirety. See Spec. Sess. P.A. 20-3, § 16;[14] see also Office of Legislative Research, Bill Analysis, HB 6002 (as amended by House "A" and "D"), An Act Concerning Absentee Voting and Reporting of Results at the 2020 State Election and Election Day Registration (2020) p. 2, available at https://www.cga.ct.gov/ 2020/BA/PDF/2020HB-06002-R01SS1-BA.PDF (last visited February 9, 2021). As we previously noted, after an expedited oral argument held on August 6, 2020, we rendered judgment affirming the judgment of the trial court, indicating that this written opinion would follow.

## I

## AGGRIEVEMENT

Because it implicates our subject matter jurisdiction, we begin with the defendant's contentions that the

---

(1) My active service in the armed forces; (2) my absence from the town in which I am eligible to vote during all of the hours of voting; (3) my illness or physical disability; (4) the tenets of my religion which forbid secular activity on the day of the primary, election or referendum; or (5) my duties as a primary, election or referendum official.

" 'Date . . . .

" ' . . . . (Signature)'

"(b) Notwithstanding the provisions of subsection (a) of this section, for the state election in 2020, each inner envelope in which an absentee ballot is returned to the municipal clerk shall have printed on its face a form containing the following statements:

" 'I hereby state under the penalties of false statement in absentee balloting that I am eligible to vote at the primary, election or referendum in the municipality in which this absentee ballot is to be cast and that I expect to be unable to appear at my polling place during the hours of voting at such primary, election or referendum for one or more of the following reasons: (1) My active service in the armed forces; (2) my absence from the town in which I am eligible to vote during all of the hours of voting; (3) my illness or physical disability; (4) the tenets of my religion which forbid secular activity on the day of the primary, election or referendum; (5) my duties as a primary, election or referendum official; or (6) the sickness of COVID-19.

" 'Date . . . .

" ' . . . . (Signature)' "

We note that the additions to the statute made by the act are underlined and the deletions are in brackets.

[14] Spec. Sess. P.A. 20-3, § 16, provides: "(*Effective from passage*) Notwithstanding any provision of the general statutes, any provisions of sections 1

Fay *v.* Merrill

plaintiffs lack standing because they are not aggrieved
and that, "if they are aggrieved, any relief in this case
should be limited to the specific primary races in which
they are candidates."[15] Relying on this court's recent
decision in *Lazar* v. *Ganim*, 334 Conn. 73, 220 A.3d 18
(2019), and the Pennsylvania Supreme Court's decision
in *Kauffman* v. *Osser*, 441 Pa. 150, 271 A.2d 236 (1970),
the defendant contends that the plaintiffs have failed
to explain how Executive Order No. 7QQ has "harmed
them or their candidacies" beyond the "abstract asser-
tion that [it] has changed the essential character of the
elections in which the plaintiffs are candidates" and
their "general interests in having a fair and honest elec-
tion . . . ." (Emphasis omitted; internal quotation
marks omitted.)

In response, the plaintiffs argue that the trial court
correctly determined that they were "personally
aggrieved" because all four of them are candidates in
the August primary, and two will be candidates in the
November 3 general election, which gives them "an
interest in knowing who is eligible to vote and the
manner in which those votes may be cast." The plaintiffs
further contend that the anticipated significant increase
in absentee voting; see footnote 9 of this opinion and
accompanying text; will change "the essential charac-
ter" of the election as one from a "snapshot" of the
primary voting day with 95 percent of the votes cast in
person to one in which 80 percent of the votes will be
cast by mail over a three week period. The plaintiffs

to 5, inclusive, of Executive Order No. 7QQ of Governor Ned Lamont, dated
May 20, 2020, that relate to the August 11, 2020, primary, are ratified."

[15] We note that, in his order granting the § 52-265a petition; see footnote
5 of this opinion; Chief Justice Robinson directed the parties "to address
the following issues in their briefs: (1) the extent to which the plaintiffs are
aggrieved by Executive Order No. 7QQ and the defendant's issuance of the
[application]; and (2) the appropriate remedy, including whether the issue
of aggrievement may limit the scope of relief that can be granted to the
primary election in which the plaintiffs are candidates."

Fay *v.* Merrill

further rely on this court's "broad jurisdiction" over declaratory judgment actions under § 52-29. With respect to remedies, the plaintiffs cite, among other cases, *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 15 A.3d 601 (2011), and argue that a declaratory judgment in their favor will do nothing more than declare the expansion of absentee voting under Executive Order No. 7QQ to be unconstitutional; they posit that no additional relief is required at this time, acknowledging that, under *Lighthouse Landings, Inc.*, additional proceedings for specific relief may well take place. We agree with the plaintiffs and conclude that, as candidates in an affected primary election, they were sufficiently aggrieved by Executive Order No. 7QQ to have standing to bring this declaratory judgment action.

"It is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue. . . . [Because] [s]tanding requires no more than a colorable claim of injury . . . a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Put differently, an action for a declaratory judgment, valuable as it has become in modern practice, is not a procedural panacea for use on all occasions. . . . In providing statutory authority for courts to grant declara-

Fay *v.* Merrill

tory relief, the legislature did not intend to broaden their function so as to include issues which would not be such as could be determined by the courts in ordinary actions. . . . The declaratory judgment procedure consequently may be employed only to resolve a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement. . . . A party pursuing declaratory relief must therefore demonstrate, as in ordinary actions, a justiciable right in the controversy sought to be resolved, that is, contract, property or personal rights . . . as such will be affected by the [court's] decision. . . . A party without a justiciable right in the matter sought to be adjudicated lacks standing to raise the matter in a declaratory judgment action. . . .

"Thus, [s]tanding is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a [well settled] twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . .

"Finally, it is well settled that [i]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.

Fay *v.* Merrill

. . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary.'' (Citations omitted; internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 727–29, 95 A.3d 1031 (2014).

This court's decision in *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 6 A.3d 726 (2010), is instructive on the issue of aggrievement. In *Bysiewicz*, this court held that a declared candidate for the Office of the Attorney General had standing to bring a declaratory judgment action seeking construction of General Statutes § 3-124 and a determination of that statute's constitutionality. Id., 759; see id., 760 (noting that candidate's ''declared intention to run for the [O]ffice of [the] [A]ttorney [G]eneral and her particular interest in avoiding the great effort and expense of running for that office if her qualifications to serve in that office could be successfully challenged upon her election are sufficient to confer standing on her to bring this action''). The court observed that, although a challenge to the candidate's qualifications via ''a quo warranto action would not be ripe until the plaintiff actually took office, [o]ne great purpose [of a declaratory judgment action] is to enable parties to have their differences authoritatively settled in advance of any claimed invasion of rights, that they may guide their actions accordingly and often may be able to keep them within lawful bounds . . . . In light of the potential injury to the plaintiff's interests if her claims are not adjudicated until after the election, *as well as the potential injury to the public's interest in avoiding voter confusion and disruptions in the election process*, including the possibility of a vacancy in the [O]ffice of [the] [A]ttorney [G]eneral, we conclude that the

Fay *v.* Merrill

action was ripe when it was brought even though the plaintiff had not yet been nominated or elected to the [O]ffice of [the] [A]ttorney [G]eneral.'' (Citation omitted; emphasis added; footnote omitted; internal quotation marks omitted.) Id., 760–61; see also *Corren* v. *Sorrell*, 151 F. Supp. 3d 479, 491–92 (D. Vt. 2015) (concluding that strategic campaign considerations give prospective candidate standing to challenge public election finance laws); *George* v. *Watertown*, 85 Conn. App. 606, 614–15, 858 A.2d 800 (noting that party need not actually seek relief under subdivision regulation to have standing to challenge its constitutionality by declaratory judgment action), cert. denied, 272 Conn. 911, 863 A.2d 702 (2004).

The defendant attacks the plaintiffs' standing based on our decision in *Lazar* v. *Ganim*, supra, 334 Conn. 73, which involved a challenge to the Bridgeport mayoral primary based on alleged improprieties in the handling of absentee ballots. Id., 76–77. In *Lazar*, we concluded that the plaintiffs, who were several registered voters, were not ''aggrieved by the ruling of an election official'' under § 9-329a (a) (1) ''because they had no specific personal interest that was affected by the improprieties complained of.'' Id., 91–92. In so concluding, we observed that ''[t]he only harm that the [voters] have claimed is that the election was unfair as a result of the improprieties, and an unfair election affects every voter,'' thus implicating the ''well established'' rule ''that a claim of injury to a general interest that all members of the community share is not sufficient to establish standing.'' (Internal quotation marks omitted.) Id. We stated that, ''if an elector were improperly denied his right to vote, the elector would have standing to bring an action pursuant to § 9-329a (a) (1) and could ask the court to correct the results to include his vote. Moreover, we find it unlikely that the legislature intended to create the situation in which, after every primary election,

Fay *v.* Merrill

thousands of potential plaintiffs would have standing to seek a new primary based on the rulings of an election official that did not personally affect them. It is more likely that the legislature intended that the proper party to seek that particular form of relief would be a losing *candidate* who could establish that the improper ruling of an election official had rendered the results unreliable.'' (Emphasis in original.) Id., 88–89; see id., 89–90 (distinguishing cases brought by candidates). The defendant's reliance on *Lazar* is misplaced. In contrast to *Lazar*, the plaintiffs in the present case specifically pleaded their interest as candidates as well as electors.[16] This candidate status gives them a personal interest that is distinct from that of an ordinary voter, particularly given the potential effect of widespread absentee voting on their campaign strategies. See *Corren* v. *Sorrell*, supra, 151 F. Supp. 3d 491–92. Accordingly, we conclude that the trial court correctly determined that the plaintiffs were aggrieved for purposes of this declaratory judgment action.[17]

---

[16] We similarly find distinguishable two other cases relied on by the defendant, namely, *Kauffman* v. *Osser*, supra, 441 Pa. 152–53, 157, which held that voters lacked standing to bring a constitutional challenge to Pennsylvania's absentee ballot statute, and *Paher* v. *Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020), in which the court held that registered voters who claimed injury by vote dilution lacked standing to challenge Nevada's all mail primary created in response to the COVID-19 pandemic. Both of these cases are distinguishable because they were not brought by candidates.

[17] At oral argument before this court, we discussed with the parties whether a grant of a declaratory judgment for the plaintiffs would have an immediate effect on the August primary, for either the Republican Party primary in which they were running, or the simultaneously conducted Democratic Party primary. As the plaintiffs pointed out, this court addressed the preclusive effects of declaratory judgments in *Lighthouse Landings*, *Inc.* v. *Connecticut Light & Power Co.*, supra, 300 Conn. 325, which observed: ''Under § 33 of the Restatement (Second) of Judgments, '[a] valid and final judgment in an action brought to declare rights or other legal relations *of the parties is conclusive in a subsequent action between them as to the matters declared*, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.' 1 Restatement (Second), [Judgments] § 33 [p. 332 (1982)].'' (Emphasis added.) *Lighthouse Landings*, *Inc.* v. *Connecticut Light & Power Co.*, supra, 352.

Fay *v.* Merrill

## II

## LACHES

Relying on *Price* v. *Independent Party of CT—State Central*, 323 Conn. 529, 147 A.3d 1032 (2016), along with federal district court cases considering recent challenges to the expansion of absentee balloting during the COVID-19 pandemic; see *Curtin* v. *Board of Elections*, 463 F. Supp. 3d 653 (E.D. Va. 2020); *Paher* v. *Cegavske*, Docket No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301 (D. Nev. May 27, 2020); the defendant contends that this action is untimely under the equitable defense of laches.[18] The defendant specifically argues that the plaintiffs unreasonably and purposefully delayed filing this action given that they did not bring the § 9-323 proceeding to this court until July 1, 2020, which was six weeks after the issuance of Executive Order No. 7QQ and slightly more than one month before the August primary, and they "then wasted another three weeks pursuing [that] baseless action" before fil-

_____

We stated that "a declaratory judgment, in and of itself, has no res judicata effect on any other claims brought, or to be brought, in a separate action." Id., 354. "[A] plaintiff who wins a declaratory judgment may go on to seek further relief, even in an action on the same claim which prompted the action for a declaratory judgment. This further relief may include damages which had accrued at the time the declaratory relief was sought . . . ." (Internal quotation marks omitted.) *Glastonbury* v. *Metropolitan District Commission*, 328 Conn. 326, 337, 179 A.3d 201 (2018), quoting *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, supra, 361 (*Palmer, J.*, dissenting); accord 1 Restatement (Second), supra, § 33, comment (c), p. 335. Accordingly, we agree with the plaintiffs that, if they had prevailed in this appeal, further proceedings would have been necessary to determine what effect, if any, a declaratory judgment for the plaintiffs would have had on the August primary, either in this action with respect to the Republican Party primary or in a separate proceeding with respect to the Democratic Party primary. See footnote 21 of this opinion.

[18] We address the special defense of laches before addressing the constitutional issues in this case because of the "general rule that [c]onstitutional issues are not considered unless absolutely necessary to the decision of a case." (Internal quotation marks omitted.) *State* v. *Apt*, 319 Conn. 494, 526, 126 A.3d 511 (2015).

Fay *v.* Merrill

ing the present action. Given the intensely factual nature of the laches defense and the lack of necessary factual development on the trial court record, we decline to consider the defendant's laches claim for the first time on appeal as an alternative ground on which to affirm the judgment of the trial court.

By way of background, we note that "(1) [l]aches consists of an inexcusable delay [that unduly] prejudices the defendant, and (2) [t]he burden is on the party alleging laches to establish that defense." (Internal quotation marks omitted.) *Price* v. *Independent Party of CT—State Central*, supra, 323 Conn. 544. "A conclusion that a plaintiff has been guilty of laches is one of fact for the trier and not one that can be made [as a matter of law], unless the subordinate facts found make such a conclusion inevitable . . . . The defense of laches, if proven, bars a plaintiff from seeking equitable relief . . . . First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant. . . . The mere lapse of time does not constitute laches . . . unless it results in prejudice to the [opposing party] . . . as where, for example, the [opposing party] is led to change his position with respect to the matter in question."[19] (Internal quotation

_____

[19] For examples of the application of the doctrine of laches in the context of elections law cases during the COVID-19 pandemic, see *Curtin* v. *Board of Elections*, supra, 463 F. Supp. 3d 659 ("The limited record here supports the conclusion that [the] [p]laintiffs had an incentive to file suit as soon as these injuries became apparent in order to rectify the perceived wrong prior to the actual commencement of the absentee ballot period. The disputed COVID-19 [g]uidance was issued to local registrars on March 16, 2020, and to the public on March 17, 2020, and the absentee ballot period began May 8 or 9, 2020, yet, [the] [p]laintiffs did not file suit until May 13, 2020. Ultimately, the [c]ourt finds that [the] [p]laintiffs failed to demonstrate the requisite diligence."); *Paher* v. *Cegavske*, supra, 2020 WL 2748301, *5 (finding timing of request for preliminary injunctive relief unreasonable when brought twenty-six days before primary and after "[mail in] ballots [had] been sent to Nevada voters and a substantial number of eligible voters . . . [had] already sent in their [mail in] ballots," and "[t]he state [had] also made significant monetary investments and efforts to implement the [primary plan] and on media and marketing campaigns to inform Nevada voters of how to exercise their right to vote via mail").

Fay *v.* Merrill

marks omitted.) *Glastonbury* v. *Metropolitan District Commission*, 328 Conn. 326, 341–42, 179 A.3d 201 (2018).

We decline to apply the doctrine of laches in the first instance on appeal as an alternative ground on which to affirm the judgment of the trial court. Although the defendant filed affidavits[20] establishing the potential prejudice in the event that the trial court issued orders affecting the August primary,[21] the plaintiffs have not

[20] Largely reflecting the rapid speed at which this case was filed and decided in the trial court, we note that the defendant did not file an answer that properly raised laches as a special defense subject to reply by the plaintiffs. See, e.g., Practice Book §§ 10-50 and 10-56; *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 397–98, 119 A.3d 462 (2015).

[21] As was discussed at oral argument before this court, the actual enforcement of any declaratory judgment that could have been rendered in the plaintiffs' favor with respect to the August primary would have raised significant practical issues for consideration by a trial court in the first instance. Consideration of these issues presumably would implicate the factors identified by the United States Supreme Court in *Purcell* v. *Gonzalez*, 549 U.S. 1, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006), which held that a court considering injunctive relief in an election law matter is "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures. *Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.*" (Emphasis added.) Id., 4–5; see *Veasey* v. *Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (reconciling stay decisions of United States Supreme Court under *Purcell* and observing that "the common thread is clearly that the decision [being stayed] would change the rules of the election too soon before the election date").

The *Purcell* principle remains applicable in the context of COVID-19. See, e.g., *Republican National Committee* v. *Democratic National Committee*, U.S. , 140 S. Ct. 1205, 1206–1208, 206 L. Ed. 2d 452 (2020) (staying District Court order that would have required Wisconsin to count absentee ballots postmarked after its primary election day on April 7, so long as they were actually received by municipal clerks by extended deadline of April 13, because that order "fundamentally alters the nature of the election," given need for potentially unworkable subsequent orders enjoining "the public release of any election results for six days after election day" because "information . . . released during that time . . . would gravely affect the integrity of the election process" and result in "judicially created confusion"); *Paher* v. *Cegavske*, supra, 2020 WL 2748301, *5–6 (denying request for injunc-

Fay *v.* Merrill

had the opportunity to establish the reasonableness of the timing of their filings as a matter of fact because the trial court declined to address the laches issue. Given the procedural circumstances of this case, we decline to consider the intensely factual defense of laches in the first instance as an alternative ground on which to affirm the judgment of the trial court. See *Deane* v. *Kahn*, 317 Conn. 157, 182–83, 116 A.3d 259 (2015) (declining to consider easement by implication as alternative ground for affirming erroneous judgment of easement by necessity because "[w]e decline to surmise whether the trial court would have made any additional factual findings if it had rendered judgment on other counts of the plaintiff's complaint, especially in light of the fact that this opinion clarified what evidence is probative of the parties' intent with respect to the scope and use of an easement"); *Doe* v. *West Hartford*, 168 Conn. App. 354, 359 n.4, 147 A.3d 1083 (2016) (whether to consider alternative grounds for affirmance not ruled on by trial court is discretionary decision for appellate court), aff'd, 328 Conn. 172, 177 A.3d 1128 (2018). Accordingly, we now turn to the merits of the plaintiffs' constitutional claims.

III

CONSTITUTIONAL CLAIMS

The plaintiffs contend that Executive Order No. 7QQ violates article sixth, § 7, because (1) neither the defendant nor the governor has the power to expand absentee voting, and, therefore, the executive order "usurp[ed] a power reserved for the electorate and the General Assembly," and (2) the "sickness" referred to in article

tive relief in federal constitutional challenge brought twenty-six days before primary to decision of two Nevada counties to make mail in ballots more accessible to registered voters in light of COVID-19 pandemic because "the election [was] days away and Nevadans [were] already exercising their right to vote" via early voting, and grant of injunctive relief would "completely upend the June [p]rimary").

Fay *v.* Merrill

sixth, § 7, does not encompass a pandemic involving an infectious disease such as COVID-19 without regard to the "individual health circumstances" of a particular voter, including with respect to whether that voter is physically "unable to appear" at the polls in person.[22]

In considering the plaintiffs' challenge to Executive Order No. 7QQ, we apply the same presumption of constitutionality and burden of proof that applies to challenges to statutes, particularly given its subsequent ratification by the legislature. See, e.g., *Ex parte Endo*, 323 U.S. 283, 299–300, 65 S. Ct. 208, 89 L. Ed. 243 (1944); *Ritchie* v. *Polis*, 467 P.3d 339, 342 (Colo. 2020); *Straus* v. *Governor*, 459 Mich. 526, 534, 592 N.W.2d 53 (1999); *Stroup* v. *Kapleau*, 455 Pa. 171, 177, 313 A.2d 237 (1973). Thus, "[d]etermining the constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in

---

[22] We note that, in their reply brief, the plaintiffs raise an additional claim that the "constitutional provision for absentee voting . . . applies [only] to an 'election,' not a primary." They argue that the language of article sixth, § 7—referring to " 'voting in the choice of any officer to be elected'—makes the same distinction between an election and a primary that the defendant already successfully argued to this court" in connection with its subject matter jurisdiction under the election contest statutes, namely, that an "[e]lection," as defined by General Statutes § 9-1 (d), is an election for officers, as compared to a "primary," the plain meaning of which is restricted to a preliminary election to choose candidates. See *Fay* v. *Merrill*, supra, 336 Conn. 449 ("the plain and unambiguous language of the election contest statutes, § 9-329a, which required the plaintiffs to initiate this action in the Superior Court, governs challenges in the primary context, and this court lacks jurisdiction under § 9-323, which applies only to general elections for federal officials"). We decline to reach the merits of this claim, as it is a new claim raised for the first time in a reply brief. See, e.g., *Haughwout* v. *Tordenti*, 332 Conn. 559, 567 n.12, 211 A.3d 1 (2019).

Fay *v.* Merrill

favor of the statute's constitutionality . . . . There-
fore, [w]hen a question of constitutionality is raised,
courts must approach it with caution, examine it with
care, and sustain the legislation unless its invalidity
is clear.'' (Internal quotation marks omitted.) *Doe* v.
*Hartford Roman Catholic Diocesan Corp.*, 317 Conn.
357, 405, 119 A.3d 462 (2015).

"In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d
1225 (1992), we enumerated the following six factors
to be considered in construing the state constitution:
(1) persuasive relevant federal precedents; (2) the text
of the operative constitutional provisions; (3) historical
insights into the intent of our constitutional forebears;
(4) related Connecticut precedents; (5) persuasive prec-
edents of other state courts; and (6) contemporary
understandings of applicable economic and sociologi-
cal norms, or as otherwise described, relevant public
policies. . . .

"The *Geisler* factors serve a dual purpose: they
encourage the raising of state constitutional issues in
a manner to which the opposing party . . . can
respond; and they encourage a principled development
of our state constitutional jurisprudence. Although in
*Geisler* we compartmentalized the factors that should
be considered in order to stress that a systematic analy-
sis is required, we recognize that they may be inextrica-
bly interwoven. . . . [N]ot every *Geisler* factor is
relevant in all cases. . . . Moreover, a proper *Geisler*
analysis does not require us simply to tally and follow
the decisions favoring one party's state constitutional
claim; a deeper review of those decisions' underpin-
nings is required because we follow only persuasive
decisions.'' (Internal quotation marks omitted.) *Feehan*
v. *Marcone*, 331 Conn. 436, 449, 204 A.3d 666, cert.
denied,      U.S.    , 140 S. Ct. 144, 205 L. Ed. 2d 35
(2019); see *State* v. *Purcell*, 331 Conn. 318, 351–52, 203
A.3d 542 (2019) (rejecting previous approach under

Fay *v.* Merrill

*Geisler* that "generally . . . assumed that the federal precedent factor weighs against the defendant if the United States Supreme Court has squarely decided the issue to the contrary under the federal constitution . . . or the federal courts are unanimous that the court would reach such a decision" in favor of approach that "consider[s] the merits of the on point decision itself," particularly "[w]hen . . . the issue to be decided is largely policy driven," based on departure from previous Supreme Court precedents, or "if the factual assumptions or legal underpinnings of a prior decision have been materially undermined by events since the Supreme Court considered the matter"). The *Geisler* analysis applies to cases in which the state constitution has no federal analogue, as well as those in which the claim is that the state constitution provides greater protection than does the federal constitution. See, e.g., *Feehan* v. *Marcone*, supra, 449–50. Accordingly, we now turn to the plaintiffs' specific constitutional claims.

A

Challenge to Governor's Authority To
Issue Executive Order No. 7QQ

The plaintiffs first argue that the text of article sixth, § 7, solely and squarely commits authority over absentee voting to the General Assembly, which renders Executive Order No. 7QQ void as a matter of law. See, e.g., *Caldwell* v. *Meskill*, 164 Conn. 299, 306–307, 320 A.2d 788 (1973) (governor's partial veto power is limited to "distinct items of appropriation"); *State* v. *Stoddard*, 126 Conn. 623, 626–27, 633, 13 A.2d 586 (1940) (holding that legislature improperly delegated its authority over regulation of sale of milk products to executive branch agency by failing to prescribe applicable standards and principles). In response, the defendant claims, inter alia, that the plaintiffs' separation of powers challenge to Executive Order No. 7QQ was rendered moot during

Fay *v.* Merrill

the pendency of this appeal by Spec. Sess. P.A. 20-3, § 16, which legislatively ratified Executive Order No. 7QQ.[23] See footnote 14 of this opinion. We agree with the defendant and conclude that the legislature's ratification of Executive Order No. 7QQ rendered the plaintiffs' separation of powers claim moot.

A separation of powers challenge to executive action is rendered moot by legislative ratification of the challenged executive action. See *We the People of Connecticut, Inc.* v. *Malloy*, 150 Conn. App. 576, 581–82, 92 A.3d 961 (2014) (separation of powers challenge to governor's executive orders allowing personal care attendants to bargain collectively was rendered moot by passage of legislation that "entirely replaced" executive orders); *Fletcher* v. *Commonwealth*, 163 S.W.3d 852, 859 (Ky. 2005) (challenge to governor's emergency budget action as violating legislature's appropriations power was rendered moot by legislature's enactment of bill ratifying governor's actions but reaching issue as capable of repetition, yet evading review); see also *Swayne & Hoyt, Ltd.* v. *United States*, 300 U.S. 297, 301–302, 57 S. Ct. 478, 81 L. Ed. 659 (1937) ("[i]t is well settled that Congress may, by enactment not otherwise inappropriate, ratify . . . acts which it might have authorized . . . and give the force of law to official action unauthorized when taken" (citation omitted; internal quotation marks omitted)). Accordingly, we conclude that the legislature's ratification in its entirety

---

[23] The defendant further contends that Executive Order No. 7QQ was legislatively authorized by the governor's broad emergency power under § 28-9 (b) (1) to "modify . . . any statute . . . ." See footnote 6 of this opinion. In response, the plaintiffs argue that § 28-9 (b) cannot be read to allow that modification because the first clause of the absentee ballot amendment textually commits control over absentee balloting to the legislature. Given the ratification of Executive Order No. 7QQ by § 16 of Spec. Sess. P.A. 20-3, we need not consider whether § 28-9 (b), which expressly shares legislative power with the executive branch on a temporary emergency basis, rendered the executive order constitutional.

Fay *v.* Merrill

of Executive Order No. 7QQ via Spec. Sess. P.A. 20-3, § 16, rendered moot any claim that Governor Lamont usurped the legislative power over absentee balloting.[24] Accordingly, we dismiss the plaintiffs' separation of powers claim as moot and do not reach its merits.[25]

B

Whether "Sickness" Encompasses COVID-19 Without Regard to Circumstances of Individual Voter

Finally, we turn to the plaintiffs' claim that the word "sickness," as used in article sixth, § 7, does not permit the extension of a blanket exemption for COVID-19 for any and all voters but, instead, requires that the individual voter be actually "unable to appear" at the polling place because of that voter's personal sickness or individual risk of susceptibility to COVID-19. Observing that there is no stand-alone federal constitutional right to an absentee ballot; see, e.g., *McDonald* v. *Board of Election Commissioners*, 394 U.S. 802, 809–10, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969); the plaintiffs cite the

[24] The plaintiffs argue in their reply brief that a live controversy remains as to the constitutionality of Executive Order No. 7QQ after its ratification by the legislature, but they do not respond to the defendant's specific argument that the ratification cured any defect in the governor's specific authority to address the topic of absentee voting. The plaintiffs do, however, ask us to apply the doctrine of vacatur to the trial court's decision should we deem the separation of powers challenge moot. Outside of a single citation to *State* v. *Singleton*, 274 Conn. 426, 876 A.2d 1 (2005), the plaintiffs do not explain why they are entitled to the "extraordinary remedy" of vacatur. *In re Emma F.*, 315 Conn. 414, 431, 107 A.3d 947 (2015). Accordingly, we deem this request inadequately briefed and decline to consider it further. See, e.g., *State* v. *McCleese*, 333 Conn. 378, 424, 215 A.3d 1154 (2019).

[25] In ruling from the bench after oral argument, we initially affirmed the judgment of the trial court in its entirety. Given the jurisdictional implications of our conclusion that the plaintiffs' separation of powers claim is moot, the rescript of this opinion has been corrected to indicate that the appeal is dismissed with respect to that claim. See, e.g., *State* v. *Campbell*, 328 Conn. 444, 463–66, 180 A.3d 882 (2018) (dismissing penalty phase challenge in death penalty appeal as rendered moot by abolition of death penalty and unripe by virtue of fact that defendant had not yet been resentenced).

Fay *v.* Merrill

Texas Supreme Court's recent decision in *In re State*, 602 S.W.3d 549, 560 (Tex. 2020), holding that the lack of COVID-19 immunity is not a " 'physical condition' " under that state's absentee voting statute, along with the interpretation of the word "sickness" in an insurance policy in *Rocci* v. *Massachusetts Accident Co.*, 226 Mass. 545, 116 N.E. 477 (1917), to contend that the plain meaning of the word "sickness" in article sixth, § 7, refers to an individual voter's condition of being sick. They cite case law from this court; see, e.g., *Keeley* v. *Ayala*, 328 Conn. 393, 406–407, 179 A.3d 1249 (2018); along with public hearing testimony from members of the Connecticut Town Clerks Association urging the legislature to reject all mail or "no excuse" absentee balloting in arguing that expanded absentee balloting raises the risk of fraud and mistakes leading to potential disenfranchisement.[26] They also view as "particularly telling" the failure of any of the speakers in support of the House Resolution that was ratified as article sixth, § 7, to mention the global 1918 influenza pandemic that had occurred approximately one decade before.

In response, the defendant contends that the COVID-19 exemption in Executive Order No. 7QQ is constitutional under article sixth, § 7. The defendant first relies on dictionary definitions of the word "sickness" that refer broadly to "a specific disease" without reference to an individual person's condition, observing that such clause of article sixth, § 7, is worded differently from

_____

[26] To this end, the plaintiffs observe that there have been numerous failed attempts to amend the state constitution to expand the use of absentee ballots, including the electorate's rejection in 2014 by a 40,000 vote margin of an amendment that would have "remove[d] restrictions concerning absentee ballots and . . . permit[ted] a person to vote without appearing at a polling place on the day of an election"; K. Sullivan; Office of Legislative Research, Ballot Question and Explanatory Text for Proposed Constitutional Amendment, August 19, 2014, p. 1; and the 2019 failure in the legislature of an attempt to put no excuse absentee voting on the ballot as a constitutional amendment. See Substitute House Joint Resolution No. 161 (2019).

the religious tenets language in the same constitutional provision that is plainly and unambiguously linked to the practice of a specific voter. The defendant argues that the broader definition of "sickness" to include an illness not suffered by the voter personally is supported by the Arkansas Supreme Court's decision in *Forrest* v. *Baker*, 287 Ark. 239, 698 S.W.2d 497 (1985), and posits that the Texas Supreme Court's recent decision in *In re State*, supra, 602 S.W.3d 549, is based on distinguishable statutory language. Beyond those Connecticut cases establishing principles of constitutional interpretation, particularly that the state constitution is "a living document" that is an "instrument of progress"; (internal quotation marks omitted) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 156, 957 A.2d 407 (2008); the defendant also relies heavily on the Superior Court's construction of the phrase "unable to appear" in *Parker* v. *Brooks*, Superior Court, judicial district of New Haven, Docket No. CV-92-0338661-S (October 20, 1992) (7 Conn. L. Rptr. 492). The defendant deems the history of article sixth, § 7, to be less than instructive, insofar as the remarks in the history of the House Resolution that was enacted as article sixth, § 7, are the speakers' "anecdotal personal experiences that prompted them to support absentee voting," none of which "express[es] an opinion about the full scope of that constitutional language or whether it could include the circumstances at issue here." With respect to federal case law, the defendant cites several federal district court decisions invalidating certain limitations on absentee voting in light of the COVID-19 pandemic. She also argues that the United States Supreme Court's venerable compulsory vaccination decision in *Jacobson* v. *Massachusetts*, 197 U.S. 11, 26–27, 25 S. Ct. 358, 49 L. Ed. 643 (1905), "strongly counsels" in support of sustaining Executive Order No. 7QQ, which was an exercise of the police power intended to protect, rather than to restrict, the

Fay *v.* Merrill

fundamental right to vote during the COVID-19 pandemic, which, as of the time this appeal was argued, had already taken more than 4300 lives in Connecticut alone. We agree with the defendant's reading of article sixth, § 7, and conclude that the word "sickness," as used therein, encompasses the existence of a specific disease such as the COVID-19 pandemic addressed by Executive Order No. 7QQ and is not limited to an illness suffered by an individual voter.

1

Constitutional Language

We begin with the text of article sixth, § 7, which provides: "The general assembly may provide by law for voting in the choice of any officer to be elected or upon any question to be voted on at an election by qualified voters of the state who are *unable to appear at the polling place* on the day of election because of absence from the city or town of which they are inhabitants or *because of sickness* or physical disability or because the tenets of their religion forbid secular activity." (Emphasis added.) The plaintiffs raise two significant points as to the constitutional language. First, they argue that "unable," for purposes of "unable to appear," means "helpless" or "incompetent," which would constitute a complete inability to get to the polls. Second, they argue that "sickness" narrowly refers to a condition personal to the voter rather than an infectious disease affecting the community at large like COVID-19.

"In dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. . . . Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution. . . . Moreover, we do not supply constitutional language that the drafters intentionally

Fay *v.* Merrill

may have chosen to omit.'' (Citation omitted; internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 273, 990 A.2d 206 (2010) (plurality opinion); see *Sheff* v. *O'Neill*, 238 Conn. 1, 26–27, 678 A.2d 1267 (1996) (considering education clause in article eighth, § 1, of Connecticut constitution in light of prohibition of segregation in article first, § 20). As with statutes, we consult dictionaries to determine the ordinary meaning of state constitutional provisions. See, e.g., *State* v. *Damato-Kushel*, 327 Conn. 173, 186, 173 A.3d 357 (2017); *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, supra, 279; *Stolberg* v. *Caldwell*, 175 Conn. 586, 594, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981).

Turning to the plaintiffs' first argument, we note that the word ''unable'' is broadly defined as ''lacking the necessary power, competence, *etc.*, to accomplish some specified act . . . .'' (Emphasis added.) Dictionary.com, available at https://www.dictionary.com/browse/unable# (last visited February 9, 2021); see also American Heritage College Dictionary (4th Ed. 2007) pp. 3, 1490 (defining ''unable'' as opposite of ''[h]aving sufficient power or resources''); Webster's Third New International Dictionary (2002) p. 2481 (defining ''unable'' as ''not able'' and synonymous with ''unqualified,'' ''incompetent,''''inefficient,'' ''impotent,'' or ''helpless''). Read in context, the text of article sixth, § 7, suggests that *physical* inability to get to the polling place on election day is not the sine qua non for rendering a voter ''unable to appear'' there. Instead, that determination of ability is squarely within the individual voter's control or judgment. For example, a voter who requests an absentee ballot because of the tenets of his or her religion may well be physically able to get to the polling place but has nevertheless made the personal decision to adhere

Fay *v.* Merrill

to religious tenets that would forbid the act of in person voting. Second, a strict reading of "unable" does not account for the voter who may be physically able to get to the polling place, but only after a great deal of exertion or obtaining assistance from others. See *Parker* v. *Brooks*, supra, 7 Conn. L. Rptr. 494. The plaintiffs' purely physical focus in reading the term "unable" is inconsistent with the fact that it is entirely subject to the individual actions and motivations of the voter.[27]

This brings us to the plaintiffs' contention that the word "sickness" encompasses solely a condition personal to the voter rather than an infectious disease affecting the community at large like COVID-19. One dictionary defines "sickness" in relevant part as "[t]he condition of being sick; illness," or "[*a*] *disease*; a malady." (Emphasis added.) American Heritage College Dictionary, supra, p. 1287. Another dictionary defines it as "a particular disease or malady," or "the state or an instance of being sick; illness." Dictionary.com, available at https://www.dictionary.com/browse/sickness# (last visited February 9, 2021).

These definitions tend to support the defendant's interpretation of article sixth, § 7. First, the word "sickness" has a second meaning beyond a particular voter's "condition of being sick," insofar as it encompasses a "disease" or "a particular disease or malady."[28] This is

---

[27] As was discussed at oral argument before this court, using the example of a Hartford area voter attending a pool party on the shoreline for a full day on election day, a voter may create his or her inability to appear at the polling place that day merely by absenting him or herself from town.

[28] We note that the plaintiffs rely on the defendant's March 2, 2012 testimony before the Government Administration and Elections Committee in support of a constitutional amendment that would have amended article sixth, § 7, "to remove the current barriers . . . that allow voting by absentee ballot for only specified reasons," which would then enable the "General Assembly . . . to consider other ways to cast a ballot without appearing in person at [the] poll on election day." Conn. Joint Standing Committee Hearings, Government Administration and Elections Committee, Pt. 1, 2012 Sess., pp. 213–14, testimony of Secretary of the State Denise W. Merrill. This amendment would have allowed the legislature to study and implement

Fay *v.* Merrill

particularly so when it is read in juxtaposition with the religious tenets reason, which, in contrast to the word "sickness" standing alone, uses language that is personal to the specific voter by referring to "the tenets of *their* religion [that] forbid secular activity." (Emphasis added.) Conn. Const., art. VI, § 7. The presence of this language tying religious observance to the voter personally, in the absence of similar words so limiting "sickness," strongly suggests that the term "sickness" is capacious enough to include an identified illness such

---

modern measures such as "voting by mail, early voting, regional voting or what we call [no excuse] absentee balloting, where [a voter] wouldn't . . . need a specific reason to use an absentee ballot . . . ." Id., p. 214. The defendant suggested that a constitutional amendment was necessary, citing as an example the blizzard in October, 2011, when residents who were located in their towns but unable to get to their polling places because of blocked roadways could not vote by absentee ballot because, "under our current [absentee ballot] laws, these kinds of emergencies don't qualify as one of the reasons in our statutes or [state] constitution for someone to vote absentee." Id., p. 216. The defendant then went on to state: "In fact, a spouse who is a caregiver to the husband or wife who doesn't want to leave the ailing spouse's bedside is not even allowed to vote by absentee ballot, because you have to be disabled yourself in order to get an absentee ballot. These are the kinds of restrictions that I think need to change. The only way to do it is to remove this language from the [state] constitution . . . ." Id.

We agree with the plaintiffs that the interpretation of an elections law provision by the secretary of the state, who is the state's chief elections official, may be a persuasive indication of the provision's meaning, albeit one not binding on us. See, e.g., *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 488–89 n.21, 55 A.3d 251 (2012); accord *State* v. *Santiago*, 318 Conn. 1, 71, 122 A.3d 1 (2015) ("it is noteworthy that [the] [c]hief [s]tate's [a]ttorney . . . who heads the Division of Criminal Justice and represents the state in this matter, has himself publicly taken the position that, following a prospective repeal, any efforts to execute those already on death row would be unlikely to pass constitutional muster"). At oral argument before this court, however, counsel for the defendant contended that we should not consider her 2012 testimony in interpreting article sixth, § 7, because it (1) did not address the context of a public health emergency like COVID-19, and (2) was vague with respect to whether she had referred to the constitution *or* the statutes as imposing the applicable limitations. We agree with the defendant and do not consider her 2012 testimony before the legislature to be a persuasive interpretation of article sixth, § 7, as applied in the context of a pandemic.

Fay *v.* Merrill

as COVID-19 that has created a public health emergency.

Although the text of article sixth, § 7, is supportive of the defendant's reading, the plaintiffs' reading is also reasonable, which renders the provision sufficiently ambiguous so as not to render the textual factor dispositive of this issue. Accordingly, "we necessarily must continue with our review of the other *Geisler* factors." *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, supra, 295 Conn. 279.

2

Constitutional History

We now consider the history of absentee voting under the Connecticut constitution. Approximately seventy years prior to the adoption of article sixth, § 7, the 1818 constitution was temporarily amended to allow soldiers serving in the Civil War to vote in the 1864 election by absentee ballot. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 161. This temporary amendment was a response to this court's decision in *Opinion of the Judges of the Supreme Court*, 30 Conn. 591 (1862), which had declared unconstitutional a statute that allowed soldiers fighting in the Civil War to vote for state officers by absentee ballot; the court relied on existing constitutional language requiring that voters cast their votes in their towns on election day. See id., 600–601; see also id., 594–96 (contrasting provisions of Pennsylvania constitution and concluding that Connecticut constitution was "explicit in its direction" as to place of election, namely, "an 'electors' meeting,' composed of the electors in the respective towns qualified to vote in the town" (emphasis omitted)).

Nearly seventy years later, in 1932, the electorate adopted article sixth, § 7, as article XXXIX of the amend-

338 Conn. 1 SEPTEMBER, 2021 37

Fay *v.* Merrill

ments to the 1818 constitution.[29] See W. Horton, supra, pp. 160–61. Proponents of the proposed amendment reported wide, popular support from their towns for absentee voting and observed that Connecticut was one of the few states that did not provide for absentee voting at the time. See Conn. Joint Standing Committee Hearings, Constitutional Amendments, 1929 Sess., pp. 2–4. The discussion of the term "sickness" was very brief and limited to supporters' anecdotes about their ill or infirm relatives who had not been able to vote in person.[30] Id., p. 3. Although we agree with the plaintiffs that it is somewhat curious that none of the speakers' remarks mentioned the 1918 global influenza pandemic, which took place approximately one decade before, we do not draw any inferences from their silence on that point, given the limited nature of the discussion and the lack of opposition on the record before the committee. Accordingly, the very limited history of article sixth, § 7, does not shed light on whether the provision's framers intended for it to encompass an illness not suffered by the voter personally, such as a pandemic generally, and we move on to the next *Geisler* factor.

3

Connecticut Case Law

Beyond this court's 1862 decision in *Opinion of the Judges of the Supreme Court*, supra, 30 Conn. 591, the

---

[29] The portion of article sixth, § 7, providing "or because the tenets of their religion forbid secular activity" was added in 1964 by article XII of the amendments to the 1955 constitution. See W. Horton, supra, p. 160. We note that there was no recorded debate with respect to that provision. See id.

[30] One member of the public speaking in support of the amendment stated: "I would like to illustrate an instance in my own family—my father is [seventy-eight] years old and he has always voted, and [has] taken a great deal of interest in voting the Republican ticket. On account of illness he has to go to Florida or California, or some other warm climate. In order to have the privilege of voting he has in the past had to go to a [s]ummer camp in Maine and register there. For the last [ten] or [twelve] years he has voted there.

"I also have an [u]ncle who is [t]reasurer of the [t]own of Wethersfield and a short time ago he was seriously ill, and has since died. During the

Fay *v.* Merrill

most significant Connecticut authority on point is the
Superior Court's decision by then Judge Vertefeuille in
*Parker* v. *Brooks*, supra, 7 Conn. L. Rptr. 494, interpre-
ting § 9-135, which is worded similarly to article sixth,
§ 7. In *Parker*, the court rejected a claim that numerous
elderly and disabled voters, who had conditions such
as heart disease, diabetes, and arthritis and lived in a
New Haven apartment building, were not "unable to
appear" for purposes of § 9-135 because they could
venture out of their apartments at times, some with
assistance. Id., 493–94. Citing this court's decision in
*Wrinn* v. *Dunleavy*, 186 Conn. 125, 440 A.2d 261 (1982),
Judge Vertefeuille found that the construction of § 9-
135 urged in *Parker* was "not consistent with a liberal
interpretation designed to further the right of suffrage,"
as required by this court's decision in *Wrinn* v. *Dun-
leavy*, supra, 142, and certain sister state cases. See
*Parker* v. *Brooks*, supra, 494. The court relied on its
observations of "the tenant-absentee voters as they tes-
tified in this matter. Although not bedridden or limited
to the confines of their apartments, many of them are
frail and walk or move about *only with difficulty*. If
they were deprived of the right to cast absentee ballots,
many of them would not vote at all rather than going to
the polls. A liberal construction of the absentee voting
statute is necessary to preserve their right to vote."
(Emphasis added.) Id.; see id. (noting that voter's repre-
sentation on his or her absentee ballot application
reflects "the voter's expectations" rather than his or
her physical capabilities on day of election). *Parker*,
then, supports the defendant's contention that a voter's
ability to appear is uniquely subjective and should be

past election he was made seriously ill from the fact that he could not vote.
The doctor would not allow him to go to town to vote." Conn. Joint Standing
Committee Hearings, Constitutional Amendments, 1929 Sess., p. 3.

Fay *v.* Merrill

liberally construed in favor of the right to vote,[31]
although it does not shed any light on the meaning
of "sickness."

4

Federal Case Law

This case differs from those involving the typical
*Geisler* analysis because there are no federal cases
directly on point, given the lack of a federal constitu-

[31] The plaintiffs, relying on a decision by the State Elections Enforcement
Commission, disagree with the Superior Court's application of a liberal
construction of § 9-135 in *Parker*. See *In re DeCilio*, State Elections Enforce-
ment Commission, File No. 2017-057 (March 23, 2018). In *In re DeCilio*, the
elections agency determined that absentee balloting under § 9-135 consti-
tutes an exception to the "default rule . . . in Connecticut" of in person
voting, cited this court's decision in *Commission on Human Rights &
Opportunities* v. *Sullivan*, 285 Conn. 208, 222, 939 A.2d 541 (2008), for the
general proposition that statutory exceptions are strictly construed, and
then strictly construed § 9-135 in concluding that an "unofficial" or "party
checker" is not an "elections official" entitled to cast an absentee ballot
under § 9-135. We reject the approach of the elections commission in *In re
DeCilio* because it is inconsistent with decisions of both this court and the
majority of our sister states, which construe absentee balloting statutes
liberally in furtherance of the right to vote; these cases hold only that
"substantial," rather than "strict," compliance is necessary with the statutory
provisions governing absentee balloting in order to protect the sanctity of
the vote by preventing fraud. See, e.g., *Erickson* v. *Blair*, 670 P.2d 749, 754
(Colo. 1983); *Wrinn* v. *Dunleavy*, supra, 186 Conn. 141–42; *Dombkowski* v.
*Messier*, 164 Conn. 204, 209, 319 A.2d 373 (1972); *Boardman* v. *Esteva*, 323
So. 2d 259, 264 (Fla. 1975); *Adkins* v. *Huckabay*, 755 So. 2d 206, 218 (La.
2000); *McCavitt* v. *Registrars of Voters*, 385 Mass. 833, 844, 434 N.E.2d 620
(1982); *Shambach* v. *Bickhart*, 577 Pa. 384, 392, 845 A.2d 793 (2004); see
also M. Dransfield, Annot., "Construction and Effect of Absentee Voters'
Laws," 97 A.L.R.2d 257, 266–67, § 5 (1964) (discussing national split in
authority).

These cases, however, are of limited persuasive value insofar as they
consider the effect of a voter's failure to comply strictly with the technical
requirements of absentee balloting, as opposed to the different and more
fundamental question of whether a voter should be permitted to vote absen-
tee in the first place. Our independent research has identified one case
extending this principle of liberal construction to the interpretation of a
state constitution's absentee ballot clause, which we find persuasive given
the purpose of article sixth, § 7, namely, to make the fundamental right to
vote more accessible to qualified voters. See *In re Lawrence*, 353 Mo. 1028,
1034, 185 S.W.2d 818 (1945) (applying liberal construction "in aid of the

Fay *v.* Merrill

tional analogue to article sixth, § 7. A brief review of federal case law nevertheless provides important context for Executive Order No. 7QQ. The United States Supreme Court's 1905 decision in *Jacobson* v. *Massachusetts*, supra, 197 U.S. 26–27, which upheld compulsory vaccination laws, has long been cited for the proposition that a state has broad police powers in the area of public health, which may include the restriction of personal liberties through measures such as quarantines. See, e.g., *South Bay United Pentecostal Church* v. *Newsom*, U.S. , 140 S. Ct. 1613, 1614, 207 L. Ed. 2d 154 (2020) (Roberts, C. J., concurring in denial of application for injunctive relief) (rejecting church's first amendment free exercise challenge to California executive order imposing 25 percent occupancy cap on worship services because of COVID-19); *Elim Romanian Pentecostal Church* v. *Pritzker*, 962 F.3d 341, 346–47 (7th Cir. 2020) (rejecting church's first amendment free exercise challenge to Illinois executive order limiting public gatherings to ten people due to COVID-19), petition for cert. filed, 89 U.S.L.W. 3148 (U.S. October 22, 2020) (No. 20-569); *Bayley's Campground, Inc.* v. *Mills*, 463 F. Supp. 3d 22, 35 (D. Me. 2020) (considering state's powers under *Jacobson* in light of significant burden on fundamental right to travel and denying motion for preliminary injunction of governor's fourteen day quarantine order because "[i]t is not at all clear that there are any less restrictive means for the

right of suffrage" in concluding that state constitution's absentee ballot clause did not require "mere physical presence within the state on the day of election as a condition of eligibility to vote a civilian absentee ballot" (internal quotation marks omitted)); cf. *State ex rel. School District of the City of Jefferson, Cole County* v. *Holman*, 349 S.W.2d 945, 947 (Mo. 1961) (applying liberal construction to statute in resolving question of "at what elections may a voter who comes within the provisions of the absentee voting laws cast an absentee ballot" and distinguishing that issue from strict construction historically applied to voters' obligations under absentee ballot laws).

Fay *v.* Merrill

state to . . . meet [its] goal of curbing COVID-19,'' with such measures being ''matters of public policy to be implemented by politicians and to be evaluated by voters, not by unelected judges''), aff'd, 985 F.3d 153 (1st Cir. 2021). But see *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, U.S. , 141 S. Ct. 63, 66–67, 208 L. Ed. 2d 206 (2020) (applying strict scrutiny and enjoining enforcement of executive order capping attendance at religious services held in ''red'' or ''orange'' COVID-19 zones because order was not narrowly tailored, and religious institutions were treated much more strictly than either essential or nonessential businesses in those zones, which did not have similar caps).

Beyond the state's police power under *Jacobson*, Executive Order No. 7QQ, which was intended to protect the fundamental right to vote, is consistent with the United States constitution's grant of ''broad powers'' to the ''[s]tates . . . to determine the conditions under which the right of suffrage may be exercised . . . absent of course the discrimination [that] the [c]onstitution condemns.'' (Citations omitted.) *Lassiter* v. *Board of Elections*, 360 U.S. 45, 50–51, 79 S. Ct. 985, 3 L. Ed. 2d 1072 (1959); see *Texas Democratic Party* v. *Abbott*, 961 F.3d 389, 407 (5th Cir. 2020) (observing that article one, § 4, of United States constitution ''gives the states authority over [t]he Times, Places and Manner of holding Elections for Senators and Representatives . . . which power is matched by state control over the election process for state offices'' (citation omitted; internal quotation marks omitted)). But see *Democratic National Committee* v. *Wisconsin State Legislature*, U.S. , 141 S. Ct. 28, 34 n.1, 208 L. Ed. 2d 247 (2020) (Kavanaugh, J., concurring in denial of application to stay) (concluding that text of article two of United States constitution means that ''the state courts do not have a blank check to rewrite state election laws for

Fay *v.* Merrill

federal elections'' and that, as matter of federal constitutional law, ''a state court may not depart from the state election code enacted by the legislature''); *Bush* v. *Gore*, 531 U.S. 98, 112–13, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000) (Rehnquist., C. J., concurring) (stating that article II, § 2, of United States constitution, governing appointment of presidential electors, presents ''[an] exceptional [case] in which the [c]onstitution imposes a duty or confers a power on a particular branch of a [s]tate's government,'' namely, state legislatures, giving ''the text of the election law itself, and not just its interpretation by the courts of the [s]tates . . . independent significance''). There is no independent federal constitutional right to vote by an absentee ballot so long as all eligible voters are provided with the right to vote. See *McDonald* v. *Board of Election Commissioners*, supra, 394 U.S. 808–10 (state was not required to provide pretrial detainees incarcerated in their home counties with absentee ballots, even though detainees held outside their home counties would qualify for absentee ballots, given lack of proof that those detained in their home counties had been barred from voting). States may, however, make rational classifications as to who may receive an absentee ballot, but they may not impose discriminatory, undue or irrational burdens on their use, particularly in a way that constitutes an outright denial of the franchise. See *O'Brien* v. *Skinner*, 414 U.S. 524, 530, 94 S. Ct. 740, 38 L. Ed. 2d 702 (1974) (proof of complete denial of right to vote to pretrial detainees held in home counties was equal protection violation when ''they are simply not allowed to use the absentee ballot and are denied any alternative means of casting their vote although they are legally qualified to vote''); *McDonald* v. *Board of Election Commissioners*, supra, 807 (concluding that, ''once the [s]tates grant the franchise, they must not do so in a discriminatory manner,'' particularly with respect to suspect classifica-

Fay *v.* Merrill

tions, including race and wealth); *Price* v. *Board of Elections*, 540 F.3d 101, 112 (2d Cir. 2008) (denial of absentee ballot in party county committee elections was unconstitutionally arbitrary given "that the state's proffered reasons have such infinitesimal weight that they do not justify the burdens imposed"); see also footnote 36 of this opinion (discussing *Anderson-Burdick* framework for evaluating election laws that burden right to vote).

Indeed, concerns attendant to COVID-19 have not diminished federal deference to state officials' control over the election process, including expanded access to absentee voting, as long as those innovations do not impose irrational, undue, or discriminatory burdens on the right to vote.[32] One notable example is *Texas Democratic Party* v. *Abbott*, supra, 961 F.3d 389, in which the United States Court of Appeals for the Fifth Circuit

[32] Numerous cases challenging a variety of state restrictions in the context of COVID-19 illustrate the proposition that, once a state provides for absentee voting, it may not impose irrational or undue burdens on the exercise of that right. These decisions invalidated restrictions such as witnessing requirements, signature matching, and voter paid postage as undue burdens on the exercise of the right to vote via absentee ballot as not justified by their minimal levels of effectiveness in advancing the state's interest in preventing election fraud. See *People First of Alabama* v. *Merrill*, 467 F. Supp. 3d 1179, 1211–19 (N.D. Ala. 2020), appeal dismissed, United States Court of Appeals, Docket No. 20-12184-GG (11th Cir. July 17, 2020); *Thomas* v. *Andino*, Docket Nos. 3:20-cv-01552-JMC and 3:20-cv-01730-JMC, 2020 WL 2617329, *21 (D.S.C. May 25, 2020); *League of Women Voters of Virginia* v. *Virginia State Board of Elections*, 458 F. Supp. 3d 442, 452–54 (W.D. Va. 2020); *Lewis* v. *Hughs*, 475 F. Supp. 3d 597, 615–16 (W.D. Tex. 2020), aff'd, Docket No. 20-50654, 2020 WL 5511881 (5th Cir. September 4, 2020), order withdrawn, Docket No. 20-50654, 2020 WL 6066178 (5th Cir. October 2, 2020). But see *Democracy North Carolina* v. *North Carolina State Board of Elections*, 476 F. Supp. 3d 158, 207–208 (M.D.N.C. 2020) (concluding, inter alia, that single witness requirement and voter identification requirement for absentee ballots were not undue burden on right to vote during COVID-19 pandemic, given factual findings that those activities could be accomplished safely while maintaining social distancing and using other precautions such as masks, particularly given state's interest in maintaining election integrity, as highlighted by recent high profile instance of absentee ballot fraud).

Fay *v.* Merrill

followed *McDonald* and held that the equal protection clause and the twenty-sixth amendment to the United States constitution did not require Texas "to give everyone the right to vote by mail" in light of the COVID-19 pandemic. Id., 409. Specifically, the court held that a Texas statute that afforded voters sixty-five years old and older the right to vote by mail did not violate the equal protection rights of younger voters. Id., 402; see also *Texas Democratic Party* v. *Abbott*, 978 F.3d 168, 192–93 (5th Cir. 2020) (merits decision holding that extension of privilege to older voters was not abridgement of younger voters' rights under twenty-sixth amendment). Applying rational basis review because age is not a suspect class, and observing that Texas had implemented other safety measures to protect in person voters, such as social distancing, protective masks for poll workers, and enhanced sanitizing of facilities and equipment, the court held that there was no evidence that the absentee balloting rules or other state action "absolutely prohibited" the younger voters from exercising their right to vote. (Internal quotation marks omitted.) *Texas Democratic Party* v. *Abbott*, supra, 961 F.3d 404. The Fifth Circuit emphasized that "[rational basis] review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." (Internal quotation marks omitted.) Id., 407; see *Tully* v. *Okeson*, 977 F.3d 608, 613–17 (7th Cir. 2020) (following *McDonald* and upholding denial of motion for preliminary injunction because plaintiffs could not show likelihood of success on their claim that, because of effects of COVID-19, equal protection clause or twenty-sixth amendment required Indiana to extend statutorily limited absentee voting to all voters for upcoming general election, particularly given alternatives state provided to in person voting on election day, such as early voting); *Black Voters Matter Fund* v. *Raffensperger*, 478 F. Supp. 3d 1278, 1285, 1315, 1323–24

Fay *v.* Merrill

(N.D. Ga. 2020) (denying motion for preliminary injunction on basis of conclusion that requiring voters to purchase stamps for application and ballot was not poll tax, with state's fiscal interest outweighing moderate burden created by obtaining postage), appeal filed sub nom. *Black Voters Matter Fund* v. *Secretary of State*, United States Court of Appeals, Docket No. 20-13414 (11th Cir. September 9, 2020); *Democracy North Carolina* v. *North Carolina State Board of Elections*, 476 F. Supp. 3d 158, 217–18 (M.D.N.C. 2020) (declining to "rewrite North Carolina's election law" by issuing injunctive relief that would, inter alia, expand "voter registration via online portals," "[establish] contactless drop boxes for absentee ballots," and "[establish] mechanisms to cure deficient absentee ballot requests and absentee ballots"). See generally E. Williams, Annot., "COVID-19 Related Litigation: Challenges to Election and Voting Practices During COVID-19 Pandemic," 54 A.L.R. Fed. 3d 383 (2020).

Viewed through the lens of the federal case law, Executive Order No. 7QQ is consistent with the state's exercise of its police power to protect the fundamental right to vote, along with its responsibility under the United States constitution to superintend elections within Connecticut. That federal case law, however, sheds no light on whether Executive Order No. 7QQ is consistent with Connecticut's own state constitutional restrictions on the use of absentee balloting.

5

Sister State Cases

Our research does not reveal any sister state case law on point as a matter of state constitutional interpretation.[33] Though not involving a constitutional provi-

[33] The defendant suggests that this paucity of sister state case law is largely the result of the vast majority—thirty-four states and the District of Columbia—offering no excuse absentee or all mail voting before the pandemic, with fourteen more—Alabama, Arkansas, Connecticut, Delaware, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, New Hampshire,

Fay *v.* Merrill

sion, perhaps the most instructive authority is the Arkansas Supreme Court's decision in *Forrest* v. *Baker*, supra, 287 Ark. 239, which considered whether "sickness in the family"; id., 243; was a legally sufficient reason for absentee voting under a statute that allows absentee voting by " '[a]ny person who, *because of illness* or physical disability will be unable to attend the polls on election day.' " (Emphasis added.) Id., 240. The court concluded that "two different voters should [not] be disenfranchised, as a matter of law, because their application recited 'sickness in the family' "; id., 243; observing that "the complaint [did] not allege that the application was false or that the sickness in the family was such that the voter was able to attend the polls. . . . A voter can have sickness in his family [that] renders him unable to attend the polls." Id., 243–44. Although *Forrest* supports the proposition that the sickness need not be that of the voter personally under statutory language similar to that of article sixth, § 7, it is not especially persuasive because it is written in a conclusory manner without a thorough textual or historical analysis.

Analytical shortcomings aside, *Forrest* nevertheless is more instructive than the Texas Supreme Court's recent decision in *In re State*, supra, 602 S.W.3d 549, on which the plaintiffs rely heavily.[34] That case held

New York, South Carolina, Tennessee, and West Virginia—expanding the right in some fashion because of the pandemic. See E. Kamarck et al., Brookings Institute, Voting by Mail in a Pandemic: A State-by-State Scorecard (last modified November, 2020), available at https://www.brookings.edu/research/voting-by-mail-in-a-pandemic-a-state-by-state-scorecard/ (last visited February 9, 2021); National Conference of State Legislatures, [Voting Outside the Polling Place]: Table 1: States with No-Excuse Absentee Voting (May 1, 2020), available at https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx (last visited February 9, 2021).

[34] We note that the discussion of sickness in *Rocci* v. *Massachusetts Accident Co.*, supra, 226 Mass. 545, on which the plaintiffs also rely, is inapposite. In that case, there was no question that the policyholder himself was sick with a respiratory illness. See id., 549–50. The question before the court concerned whether he had been "necessarily and continuously confined

Fay *v.* Merrill

that a voter's lack of COVID-19 immunity is not by itself a "physical disability" under § 82.002 (a) of the Texas Election Code, which provides for voting by mail for "disability" if "[a] qualified voter . . . *has a sickness or physical condition* that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." (Emphasis added; internal quotation marks omitted.) Id., 557, 560. The Texas court emphasized that "physical condition" must be understood in the "light" of the ordinary meaning of " 'disability,' " which "is the same word the [l]egislature has used consistently since 1935," and " '[d]isabled' normally means 'incapacitated by or as if by illness, injury, or wounds.' " Id., 560. Observing that "[i]n no sense can a lack of immunity be said to be such an incapacity," the Texas court held that "a lack of immunity to COVID-19 is not itself a 'physical condition' " under that state's absentee balloting statute.[35] Id. In our view, *In re State* is inapposite because it did not consider the breadth of the meaning of the word "sickness" and because it is based on statutory language distinguishable from article sixth, § 7, as more directly linked to the "qualified voter."

within the house" for purposes of benefits under his sickness indemnity policy when he had been removed from his own house to other dwellings during the benefit period. (Internal quotation marks omitted.) Id., 552; see id., 552–53.

[35] In so concluding, the Texas court determined that allowing the phrase "physical condition" to mean "physical state of being" would "swallow the other categories of voters eligible for [mail in] voting. A voter's location during an election period is certainly a physical state of being. So are age, incarceration, sickness, and childbirth, even participation in a program. To give 'physical condition' so broad a meaning would render the other [mail in] voting categories surplusage. Further, such an interpretation would encompass the various physical states of the entire electorate. Being too tired to drive to a polling place would be a physical condition. The phrase cannot be interpreted so broadly consistent with the [l]egislature's historical and textual intent to limit [mail in] voting." *In re State*, supra, 602 S.W.3d 559.

Fay *v.* Merrill

Finally, we consider *Fisher* v. *Hargett*, 604 S.W.3d 381 (Tenn. 2020), a recent decision from the Tennessee Supreme Court that rejected a state constitutional challenge to the election procedures in the Tennessee Election COVID-19 Contingency Plan (Tennessee plan). The Tennessee plan anticipated an increase in absentee voting but "[did] not expressly provide . . . for any expansion of those persons who are eligible to vote absentee by mail pursuant to the [state's] statute," which included persons "unable to appear at the person's polling place" because they are "hospitalized, ill or physically disabled," along with the caretakers of such persons. (Internal quotation marks omitted.) Id., 387, quoting Tenn. Code Ann. § 2-6-201 (5) (C) (Supp. 2019). The court first agreed with the state's concession that "persons with special vulnerability to COVID-19 or who are caretakers of persons with special vulnerability to COVID-19 are eligible to vote absentee by mail pursuant to the statutory eligibility requirements" and deemed injunctive relief unnecessary on that point. Id., 393–94. Turning to those persons without a special vulnerability to COVID-19, the court applied the *Anderson-Burdick* balancing framework utilized by the United States Supreme Court to assess incursions on voting rights[36]

---

[36] Under the *Anderson-Burdick* framework, it is understood that "[e]lection laws will invariably impose some burden upon individual voters. Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. . . . Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as [the] petitioner suggests, would tie the hands of [s]tates seeking to [en]sure that elections are operated equitably and efficiently. . . . Accordingly, the mere fact that a [s]tate's system creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny. . . .

"Instead . . . a more flexible standard applies. A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the [f]irst and [f]ourteenth [a]mendments that the plaintiff seeks to vindicate against the precise inter-

Fay *v.* Merrill

and determined that the exclusion from absentee voting was a "moderate" one for the voters without special vulnerabilities given that the Tennessee plan provided for social distancing, screening, and personal protective equipment at polling places. Id., 402–403. The court concluded, however, that the moderate burden on voters who neither had special vulnerabilities to COVID-19 nor were the caretakers of such voters was outweighed by the state's prophylactic interest in preventing election fraud, along with fiscal and administrative considerations. Id., 403–404. Deeming itself "constrained by the [Tennessee] [c]onstitution's delegation to the [l]egislature of the power to regulate the conduct of . . . elections," the court emphasized that the statutory scheme's "preference for [in person] voting . . . represents a policy choice" that extended to those "made with respect to the conduct of elections during the COVID-19 pandemic. These policy choices will be judged by history and by the citizens of Tennessee. We, however, properly may not and will not judge the relative merits of them, regardless of our own views."[37]

ests put forward by the [s]tate as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. . . .

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [f]irst and [f]ourteenth [a]mendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. . . . But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the [f]irst and [f]ourteenth [a]mendment rights of voters, the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." (Citations omitted; internal quotation marks omitted.) *Burdick* v. *Takushi*, 504 U.S. 428, 433–34, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992); see *Anderson* v. *Celebrezze*, 460 U.S. 780, 788–89, 103 S. Ct. 1564, 75 L.Ed.2d 547 (1983).

[37] Given that it decided *Fisher* on the eve of Tennessee's own August primary, the Tennessee Supreme Court "recogniz[ed] that absentee ballots already have been cast for the August 6, 2020 election consistent with the trial court's temporary injunction, and mindful of the goal of avoiding alterations to election rules on the eve of an election . . . the absentee ballots of all Tennessee registered voters who timely requested and submit-

Fay *v.* Merrill

Id., 404–405. Accordingly, we now turn to our examination of the public policy issues considered by our state's political branches in the promulgation and ratification of Executive Order No. 7QQ.

6

Economic and Sociological Considerations

With respect to the economic and sociological considerations factor, which is in essence a public policy analysis, the plaintiffs rely on the perceived shortcomings of absentee balloting, including statements in decisions from this court that it is a process that is potentially more susceptible to election irregularities such as mistakes and fraud. See, e.g., *Keeley* v. *Ayala*, supra, 328 Conn. 406–407; *Wrinn* v. *Dunleavy*, supra, 186 Conn. 142–44. Similarly, they cite legislative committee testimony from representatives of the Connecticut Town Clerks Association objecting to proposed constitutional amendments in 2013 and 2020 that would have expanded vote by mail opportunities on the ground that mailing delays and irregularities such as missing signatures and other errors could disenfranchise more voters. See Conn. Joint Standing Committee Hearings, Government Administration and Elections, Pt. 1, 2020 Sess., pp. 287–88, written testimony of Mark H. Bernacki, Legislative Committee Chair of the Connecticut Town Clerks Association (supporting in person early voting by tabulator but objecting to "expanding the current absentee voting process to include no excuse absentee voting that relies on [mail] delivery"); Conn. Joint Standing Committee Hearings, Government Administration and Elections, Pt. 3, 2013 Sess., pp. 918–19, written testimony of Antoinette C. Spinelli, Chair

_____

ted an absentee ballot by mail for the August 6, 2020 election pursuant to the trial court's temporary injunction and which absentee ballots otherwise meet the requirements of the absentee voting statutes shall be duly counted." *Fisher* v. *Hargett*, supra, 604 S.W.3d 385.

Fay *v.* Merrill

of the Connecticut Town Clerks Association (endorsing legislation, following proposed amendment to state constitution, which would support early in person voting and arguing against no excuse absentee balloting based on mailing delays and voter errors, while "recogniz[ing] a need to expand the existing categories of those eligible to vote by absentee ballot to include caregivers and emergency relief workers"). The plaintiffs contend that recent failures of prospective constitutional amendments that would have allowed no excuse absentee voting, one in 2014 before the electorate and one in 2019 that did not receive support from three-fourths of each of the houses of the legislature, evince the common understanding that article sixth, § 7, does not presently permit no excuse absentee voting.

The defendant, however, counters these concerns by relying on the public policies of "protecting public health and saving lives," along with "ensuring that voters are able to safely exercise their fundamental right to vote." The defendant argues that her construction of article sixth, § 7, is "consistent with the public policy that states across the nation have adopted, both before and during the pandemic," with thirty-four states that "permit all mail or no excuse absentee voting during normal times" and fourteen more that have "changed their absentee ballot laws during the pandemic to permit some form of expanded absentee voting." See footnote 32 of this opinion.

From a public policy perspective, this case presents the opposite side of the coin of *Texas Democratic Party* v. *Abbott*, supra, 961 F.3d 389, and *Fisher* v. *Hargett*, supra, 604 S.W.3d 381, insofar as our state's political branches, first Governor Lamont through Executive Order No. 7QQ, and later the legislature through its ratification of that executive order in Spec. Sess. P.A. 20-3, § 16, have seen fit to expand absentee voting in response to the COVID-19 pandemic. "Given the reason-

Fay *v.* Merrill

able policy concerns that support the parties' respective state constitutional arguments, in interpreting our state's constitution, we must defer to the legislature's primary responsibility in pronouncing the public policy of our state.'' (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 438; see, e.g., *State* v. *McCleese*, 333 Conn. 378, 406, 215 A.3d 1154 (2019) (concluding that state constitution did not require remedy beyond new legislation affording parole hearing to defendant sentenced in violation of *Miller* v. *Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), and stating that ''we do not believe that we are better situated than the legislature to strike an appropriate balance among these competing policies, particularly in an area that is traditionally within the purview of the legislature''); *State* v. *Skok*, 318 Conn. 699, 718–19, 122 A.3d 608 (2015) (rejecting defendant's claim that recording of phone conversation with consent of only one party violated her reasonable expectation of privacy under state constitution and concluding that statute providing for civil cause of action for failure to obtain consent to record by all parties to conversation, with ''multiple, wideranging exceptions,'' ''does not reflect a sweeping policy against recording all private telephone conversations . . . but rather demonstrates that the legislature has carefully balanced the concern for protecting citizens' privacy against multiple other countervailing policy interests''); *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 436–38 (considering legislative balancing of concerns of stale evidence and delayed disclosure in upholding expansion of statute of limitations to revive lapsed sexual abuse claims); *State* v. *Lockhart*, 298 Conn. 537, 574–75, 4 A.3d 1176 (2010) (The court declined to adopt a state constitutional rule requiring the recording of custodial interrogations because, although that rule would likely be beneficial, ''[d]eter-

Fay *v.* Merrill

mining [its] parameters . . . requires weighing competing public policies and evaluating a wide variety of possible rules. . . . In [the court's] view, such determinations are often made by a legislative body because it is in a better position to evaluate the competing policy interests at play . . . .'' (Citation omitted.)).

In sum, having considered the *Geisler* factors, we conclude that the plaintiffs have not established beyond a reasonable doubt that Executive Order No. 7QQ, as ratified by the legislature in Spec. Sess. P.A. 20-3, § 16, violates article sixth, § 7, of the Connecticut constitution. We observe most significantly that the constitutional language of ''unable to appear'' and ''sickness'' is sufficiently capacious to include the particular disease of COVID-19. Although the plaintiffs have identified concerns of election security and disenfranchisement that might arise from hypothetical lapses on the part of election officials or the voter during the absentee ballot process, Executive Order No. 7QQ nevertheless represents a considered judgment by our political branches that the limited expansion of absentee voting is an appropriate measure to protect public health and suffrage rights during the exceptional circumstance of a pandemic, the likes of which have not been seen in more than one century. Put differently, our political branches acted to protect the critical constitutional right to vote while accommodating public health directives not to congregate, an act that was consistent with the text of article sixth, § 7, the plain language of which permits absentee balloting for far less serious reasons, such as voluntary absences from town for leisure activities. We conclude, therefore, that Executive Order No. 7QQ does not violate article sixth, § 7, of the Connecticut constitution.

The appeal is dismissed with respect to the plaintiffs' separation of powers claim; the judgment is affirmed.

In this opinion the other justices concurred.